Good morning. Good morning. May it please the court. My name is Erwin Chemerinsky. I represent the appellate, Charles Gugliuzza. I'd like to reserve five minutes for rebuttal. Okay, Gugliuzza, then. Yes, sir. Okay, thank you. The remedy imposed by the district court was incorrect as a matter of law and unjustifiable under the facts of this case. I want to focus especially on remedy. Section 13B is limited to equitable remedies. The Supreme Court has made it clear that there must be a difference between equitable remedies and legal remedies. Equitable remedies here are about restitution. Traditionally, restitution has been about disgorgement. Restitution also implies that the remedy imposed by the district court was neither disgorgement nor losses, traces of civic victims. Untethered from this, the district court imposed a remedy that's so arbitrary as to be an abuse of discretion. Can I ask this? Let's say that in your case, like in the Beck case, the court had imposed joint and several liability. Am I right on that? No, Your Honor, on two levels. First, restitution has to be tied to disgorgement of what's held by the individual or losses traced to specific individuals. Okay, well, hang on. But I'm positing the concept of monies that the defendants collectively received. And the question then, it seems to me, would just be can I be held jointly and separately liable within the context of equitable restitution? So if you're saying no, I want to hear about that. But if you're saying yes, then I guess I don't understand. I am saying no, and the reason is that joint and several liability is a concept at law, not a concept at equity. And the reason for this is that traditionally restitution equity was about an individual having to disgorge his or her ill-gotten gains. So in the context of this case, Mr. Galluzza would be forced to disgorge what he gained. Joint and several liability is inconsistent with that concept, which is why it's always been a concept at law, not a concept at equity. Except that in the securities fraud context, right? Well, I mean, put aside our own FTC cases like Stefanczyk, but even before that, in the SEC context, joint and several liability has traditionally been imposed, and those are equitable proceedings, right? Your Honor, I want to deal with both parts of your question. In terms of the securities context, it is a different statute, and it's important to focus on the difference with regard to that. For example, we often speak of restitution in the criminal context, and yet if you look at the restatement of restitution third, section one, it makes clear that in the criminal law context, it is a legal tort concept of restitution and joint and several liability. It is not the civil SEC case. Right. Absolutely. Okay. But I'm just using that as an example to show the different contexts that exist. Okay. It would help me if, do you know of any cases holding under 13B of the FTC Act, a court may not hold co-defendants jointly and severably liable for restitution of ill-gotten revenue from a joint scheme? No, Your Honor, but nor do I know of cases that hold they can't, and I've explained to you the reason why traditionally it doesn't. All right. So there we really don't have anything that says you can or you can't. That's right. That's what you're saying. That's right, because this is an issue that hasn't been raised, and I think the security cases are inapposite here. The other point that I want to make is that you were raising Stefanczyk. I think Stefanczyk, if you read it carefully, actually supports our position. It makes clear that remedies under 13B are limited to equitable remedies and restitution. And in the context of Stefanczyk, what you had was nothing that the court did was inconsistent with it. You have to either be disgorgement or losses traced to victims. In fact, in Stefanczyk, the whole point was there would have been no difference between the legal and equitable restitution. There would be no difference in disgorgement, because Stefanczyk was the president, the CEO, ran the entire company, and so he was being asked to disgorge the ill-gotten gains. Well, okay, but hold on a second. First of all, Stefanczyk, the individual, was held jointly and severally liable for the corporation's wrongdoing, right? But this court said he was the corporation. This court pointed out in the context of... Well, sure. Okay, but I'm just saying the concept of joint and several liability was not viewed as incompatible with equitable restitution there. It wasn't discussed there, Your Honor. Okay. In the context of Stefanczyk, remedy is a very short part of Judge Stefanczyk's case. The individual got far less than the, what was it, $17 million for which he was held liable in equitable restitution, right? Most of that money was attributable to the corporation, the Behringer entity, which in turn was held liable for the losses caused by Atlas. So Stefanczyk is not So, for example, Stefanczyk, the court said, and I quote, he was the owner, the director, the shareholder, and the manager of the company. That's a very different situation. And I think if you look closely at the language of Stefanczyk, and here I'm quoting from 559F931, equity may require a defendant to restore his victims to the status quo where the loss suffered is greater than the defendant's unjust enrichment. And so this is received or it has to be losses traced to victims. And this does tie back to the Great West versus Knutson case. I very much disagree with the position of the FTC in the prior argument. Great West versus Knutson, is the Supreme Court generally addressing the difference between a legal and an equitable remedy? Is there a tension between Stefanczyk and Great West? I don't think so, Your Honor, because what Great West says is that you have in order to be restitution, either be disgorgement or clearly traced to specific victims. Nothing in Stefanczyk is inconsistent with it has to be disgorgement or losses traced to specific victims. In fact, in Great West, the court in a footnote cites the 77 other federal statutes that provide for equitable remedies. I think clearly they're indicating that the court is discussing what's the difference between an equitable and a disgorgement, in which for our purposes, in terms of what equitable remedies means, is found in the Great West case. And here on page 209 of the opinion, or especially at 213, where the court says restitution is where money or property identified as belonging to the good conscience of the plaintiff could clearly be traced to particular funds or property in the defendant's possession. Judge Watford, that's why I was saying to you that specific victims. The district court's order here is neither of those. And the district court order here says being untethered becomes so arbitrary through the use of discretion. You had here an expert witness, and this was challenged in terms of Dalbert, a third-year graduate student who said that she estimated that the loss was about 50%. The judge then said, well, since he estimated that the profits of the company were $36.4 million, he was going to hold Mr. Galusa liable for $18.2 million. That's actually also inconsistent with the evidence in the case. The evidence in the case shows that 45% of those who signed up for this canceled during the trial period. That's at volume 2 of the excerpt of record, pages 446 and 447, and volume 4 at page 838. That makes the 50% figure implausible. Plus, the record shows that over 100,000 people used this service to create websites and were apparently satisfied with it. That's at volume 2 of the excerpt of record, pages 243 and 244. That makes the 50% estimate so arbitrary as to an abuse of discretion. We believe in terms of remedy, the appropriate thing is to send this back to the district court and say, the remedy has to be just what Great West v. Knudsen says. It has to be either the disgorgement of Mr. Galusa received or losses that are traced to specific victims, as Great West says. I understand the 50% does appear to be a little bit pulled out of the air there, but there was an expert that said, well, everyone would be confused, right? So then if, say, the court had imposed 100%, you would be arguing abuse of discretion there, but if, say, the record supports 100% confusion, why is 50% wrong? The court record doesn't support either 100% or 50%. What you had here was an expert who testified. This is the exhibit 2062 and 2063, where he said that 46.32% canceled within the trial period. That means that they understood that it was a negative option. As I mentioned, we know of at least 100,000 websites that were created using this. So if the judge had said 100%, it would be arbitrary, but 50% here is also arbitrary. All you had was Jennifer King here say, well, about 50% were deceived, and then the judge using that. Notice Jennifer King never did a survey. She never did a focus group. There was no basis for it at all. It's particularly troubling here, though, because this is an abuse of discretion standard, that Mr. Galusa wanted to introduce an expert, and the expert would have said that 90.6% of people understood this. The judge excluded that expert because he had not done the survey, but under Federal Rule of Evidence 703, under the decisions of this court, an expert can testify based on the survey of others. So at the very least, what we're saying here, as a matter of remedy, there is no basis for the 50% being imposed. So counsel, in terms – I want to go back, actually, to understand your understanding of Great West and how the remedy would work. Assume the following scenario, that your client, actually under his contract, would receive nothing until there were 100,000 subscriptions. Once 100,000 was hit, he would get 50% of all the profits, so that would be the profit structure. Let's say in this case they sold 99,999, so they didn't quite hit the 100,000, so he was paid nothing in this progress. But same case otherwise. What would be the FTC's remedy against him, if he's found liable? Under traditional equity principles, if he received nothing, they could get nothing because there'd be no disgorgement. But I believe that Great West v. Knutson and Stefanczyk open up the possibility of his being able to be forced to pay for any losses that could be traced to specific victims. This is an expansion from what equity traditionally was, but it still requires that there be tracing to specific victims. In this case, the problem is, you have neither disgorgement nor tracing to victims. And I think that's why the language from Great West v. Knutson that I read is so important, because it says clearly trace to specific victims. Otherwise, Your Honor, if it's not that, then there is no difference between an equitable remedy and a legal remedy. And the Supreme Court makes clear in Great West that there must be a difference between an equitable and a legal remedy. In fact, the Seventh Amendment requires there be a difference between an equitable and a legal remedy. So if this were to go, and I'm not suggesting this is what I think about the case, but if this case were to go back and the district court were to do a tracing analysis and trace $18 million or whatever it is, then we could be right back where we are right now, having that tracing done. In terms of remedy, Your Honor, that's absolutely right. Our position in terms of remedy is that equity and restitution require that it either be disgorgement or traced. And if the district court were to do that, then at least in terms of the remedy, we wouldn't have an objection. We could certainly then argue over the joint and several liability issue, and we could argue over the liability issue as well, which is fully briefed. All right. One more factual question, if I may. I know one of the arguments you're making is that in a sense your client was not liable, and we don't need to go into all of those reasons there, but there's one thing that kind of caught my eye, the $1.95 shipping fee. So I have some questions for you about that. Sure. Could someone pay the $1.95 shipping fee via check, or did it have to be by credit card? I think it was just by credit card, so I could check, Your Honors, because I think this was done by a credit card that was done online. So what – I'm trying to think of a legitimate reason why you would charge the $1.95 shipping fee with a credit card if it wasn't intended to then unlock the credit card so you could start charging the monthly fee. Especially since we know that credit card companies charge a percentage. So, I mean, most businesses, if it's a small amount, don't want to run it through a credit card. Right. So explain why that was there. There's no denial that this was a negative option, that when people signed up, they would continue to be billed unless they canceled, as 45 percent of people did. However, our primary argument with regard to liability is that Mr. Galuzza didn't have the requisite knowledge or recklessness to be held liable. And I understand his argument that the web page was scrolled onto the next screen and different resolutions and monitors and so forth. Exactly. But why have the $1.95 fee at all? Why not just say there's a negative option and it's $29.95 a month? Well, there's a processing fee that goes on. For example, as Judge Callen said, there was a charge to them for processing the credit card. Right. And I would imagine that the reason they were charging something for people who were signing up was for exactly that reason. Their processing costs. Right. But, I mean, couldn't Judge Carney look at this and say, well, no, the reason why you charged the $1.95 is because that's the sweetener, the trick to get these people on board to hand over their credit card. And then all of a sudden they're going to get, they don't know what's coming. They're told, here's the tip of the iceberg, here's the big thing below the ocean. Well, see, a check you wouldn't be able to continue to process. Right. But a credit card, once you have it on file. But there's no doubt they wanted to continue to process. We don't deny that this was a negative option. We do deny that Mr. Galuzza had the requisite knowledge for liability. And we especially deny that the remedy here is appropriate. With your permission, I'll save my time for a button. Yeah, I'll give you five minutes. Thank you. We took a little bit of your time there. Thank you. Good morning. Good morning, Your Honors. Michelle Arrington for the Federal Trade Commission. Your Honor, the relief ordered in this case is firmly rooted in this precedent, establishing without a doubt that in actions for injunctive relief under Section 13B of the FTC Act, the District Court has broad discretion to award equitable monetary relief to redress the harm to consumers caused by the conduct, and also that individuals who meet the two-part test for personal liability, which includes authority to control or participation in the harm, and knowledge or reckless indifference to the truth of this record. Counsel, can I ask you this? Yes. You say in your brief that liability for the restitution amount was imposed jointly and severally with the other defendants, am I right? Yes, Your Honor. The amended complaint, paragraph 47 mentions that. Well, hold on. I'm not talking about what you said in the complaint. I'm talking about the judgment. The judgment, yes. That's obviously all that controls is the judgment, not what you said in the complaint. It is the judgment, Your Honor. Just hang on. All right? So I look at the judgment, and I don't see the words jointly and severally mentioned anywhere in there. Am I missing something? No. The judge did not invoke the term jointly and severally liability. That is what the Commission had asked for. The cases that the District Court cited apply joint and severally liability, so I think it's a fair inference that the Court knew exactly the – But it's an inference. The Court did not say joint and severally liability. But you think that's the basis on which Mr. Galuzza was held liable for the full 18-plus million? Yes, Your Honor. Okay. So if – just help me with this. What does that mean then when the other defendants have settled for what ends up being far less than what was probably their proportional share of the losses? What does that mean in terms of what he might ultimately have to pay? Well, Your Honor, first of all, the fact that other defendants settled, which Mr. Galuzza had the same opportunity to settle as well, doesn't relieve him of the legal standard that applies in any FTC Act case for joint and severally liability. It does not alter that standard, which he clearly met, as the District Court's careful explanation of his participation and his knowledge and the notice he received of concerns. That would be a perverse incentive for defendants not to settle if the fact that other of the participants in the deceptive scheme settled, that somehow then on the back end he would, even if proven to satisfy all of the elements for personal liability. But if you're talking about equity, and Mr. Galuzza was only the president for a year, and is on the hook now for $18.2 million, which his co-defendants only have to pay about $500,000. At a minimum, shouldn't the judgment against Galuzza have been reduced to account for the money the FTC recovered through the settlement? Well, Your Honor, first, as a factual matter, he may have been president for only a year. In his consultancy, he was de facto, had the same role. So as a factual matter, that's not quite accurate. But certainly, as the district court recognized, it seems highly unlikely, given Mr. Galuzza's representations of his ability to pay, that it will ever approximate the full amount of the judgment. And the district court said if it looks like it's getting to that amount, that Mr. Galuzza is free to petition the court to reduce the amount of the judgment. So in this case, both as a practical concern, as a practical matter, and the FTC has always said it has no intention of seeking any sort of double recovery, and the district court provided a mechanism for Mr. Galuzza to address that concern if in the unlikely event that it gets to that amount. I mean, the only way I could possibly see this judgment being upheld in the government's favor is if, in fact, we made the district court amend the judgment to say explicitly that it was joint and several liability. But maybe you can respond to counsel's argument that there is no such thing as joint and several liability in the context of equitable restitution. Well, Your Honor, I think that over 30 years of precedent from this circuit foreclosed that argument. Time and again, the basis for joint and several liability in these actions has been meeting this two-part test, which is unquestionable given the district court's analysis here and the facts, that Mr. Galuzza meets that two-part test in terms of his involvement, authority to control, knowledge, that this court has in Stefanczyk applying joint and several liability. I would like to say Mr. Chemerinsky's proposition that the Stefanczyk case is different because in that case, Mr. Stefanczyk was essentially one and the same with the corporation. If that were so, then there would be no need to move to the second part of this two-part test of knowledge. If he is essentially the corporation, then there would be no requirement to find as a basis for his liability for the entire amount that he also had knowledge. He would be on the hook for whatever the corporation, the basis for the corporation, which is just participation. Are there FTC cases in the FTC context other than Stefanczyk in which joint and several liability was imposed for equitable restitution? Yes, Your Honor. There are a number of cases. This court's decision in FTC v. Gill was affirming an award, which was for consumer redress, restitution, and or disgorgement. It did not matter because the amount is measured by the loss to consumers. In that case, Gill himself, the individual, argued, I didn't even get any money from the scheme. The court said, even if that were so, you meet the test for individual liability for corporate violations and you are on the hook for the entire amount. I'll ask you the same question I asked your counterpart. There's just no limiting principle within. Once you get to joint and several liability, if I got a dollar out of the scheme and it was a $100 million loss, I can just be held jointly and severally liable and I'm on the hook for the whole amount and all of my co-defendants are insolvent and, hey, I'm just stuck holding the bill? I think, as a legal matter, the question of whether you're on the hook for joint and several liability certainly turns on whether you satisfy that two-part test. And if you satisfy it, then you are potentially on the hook for the entire amount. Now, there may be factual limitations based on when you were involved. Maybe you weren't involved for the entire amount. But, yes, in theory, yes. As a legal matter, the question, I believe, the question as to whether you are appropriately held liable for the entire amount turns on the facts of your involvement. In this case, Mr. Gugliotta was centrally involved. And to the extent that there's any limitation to be placed on the amount that can be collected, that inquiry comes into play in looking on the facts as to whether this person was sufficiently involved, had sufficient authority to control, had sufficient knowledge, which in this case, Mr. Gugliotta clearly met that. So you think once that three-part test for individual liability is met, you automatically qualify for joint and several liability? Yes, you automatically qualify. Even if you got no money, because obviously one of the three prongs is not that you got a bunch of money. You could have gotten, in Judge Owens' hypothetical, no money. You think those three prongs are met. You're on the hook for the whole $100 million or whatever it is. This Court's decision in FTC v. Gill stands for that proposition, certainly. So what would be the Court's exercise of discretion after that point? If once a legal issue is done, then it would just—what's the exercise of discretion after that? I think that just because someone is properly held a joint and several liability for the entire amount does not require a district court to impose the full amount of liability. Let me ask you this, though, too. When you go beyond that, I'm assuming you probably have some familiarity with the Beck case as well. Yeah. I mean, Judge Wynn seemed to say it was—she found the joint and several liability, but seemed to be talking about net revenue and ill-gotten gains of all the defendants. Judge Carney seems to, in this Galuzza case, seems to be talking about total consumer injury. Yes. Is total consumer injury the right test? I mean, here, total consumer injury might be the same as the net revenue or ill-begotten gains of all the defendants, but is that the right test? I believe that Judge Carney's reference comes from this circuit's case law, which talks about the harmed consumers, and so it's been said slightly different ways in different cases, but the touchstone is the amount that the scheme took in from consumers, and that was the measure of the monetary award entered here. So it's more the ill-gotten gain of all the defendants? Yes, of the enterprise. As opposed to—because consumer injury really could be different, couldn't it be? Yes, it could, and in this context— It may not be here, but it could be. Yes. There may be other types of consumer injury in the context of FTC Act cases. When we talk about consumer losses, consumer harm, consumer injury, and this circuit's case law, it is talking about the amount that was taken in by the enterprise from whatever the transaction was. And what about the 50 percent? Is that just kind of like, okay, you know, sometimes, like, we get attorney's fees, and with no reason we just say, oh, that just seems like too much. I'm going to just cut it in half. Well, Your Honor, as Judge Carney— It seems about right. I like this amount. Judge Carney was very careful in his analysis of the amount, the calculation of this. And as the judge noted, there's a baseline where there are pervasive misrepresentations in FTC Act cases and where the nature, as the district court found from his own review of these materials, they are inherently misleading. The baseline for an award based on consumer losses is the amount of revenue subtracting out the amount that has been returned to consumers by refunds or by chargebacks. However, he gave the benefit of a doubt of a very conservative floor of 50 percent because there was some evidence that not all consumers were injured. However— Can I ask you this? Yes. In terms of the revenues coming in, for those to be eligible for disgorgement, they've got to be ill-gotten gains, right? So are they ill-gotten only if, in fact, they were received from a consumer who was actually deceived? Is that what you need? In other words, if I go on the website and I say, boy, they tried to pull a fast one on me, but I see that I'm going to actually sign up for this $39.95, $49.95 thing a month, and I go forward and, you know, I do it for a few months and I cancel. So those are revenues that came in, but I wasn't deceived. So are you saying that that's a portion of the ill-gotten gains or no? This court's cases, and as the district court recognized, it is very difficult to prove what a particular— I know. That's why I just want to get a yes or no answer. So the answer is there is a presumption that if the nature of a representation of a marketing campaign is deceptive and consumers purchased looking at those misrepresentations, there is a presumption that they relied on the misrepresentations and were injured. Now, the burden shifts then to the defendants to say, well, wait a minute. Not everybody was deceived, and to propose some other number that has an evidentiary basis. And in this case, Mr. Goliotsa, as the district court noted, basically said, no, zero is the amount. And the court said, no, that's not—he did not find that to be particularly compelling or to have an evidentiary basis. Now, he also did not find compelling or persuasive that the figures that Mr. Chemerinsky has cited and that Mr. Goliotsa offered about 46 percent canceled prior to billing, because as the district court noted, that doesn't tell you anything about how these people learned that they were going to be billed. They could as easily have learned it from having received the free kit and read it and said, well, wait a minute, this is talking about a program and looked into it further and realized that they were on the hook if they didn't cancel. So that doesn't tell you anything about the deceptiveness. The court also was quite correct in excluding the testimony about a survey based on the lack of foundation. Yeah, but let's go back to the 45 or 46 percent of the people that canceled during the trial period. Obviously, those people, none of their money got into that big pot of revenue, right? That's correct, if they were not charged. So, I mean, I guess I'm just—it just seems like a hard thing to square with the 50 percent figure that the district court used. If we know that 45 percent or so of the people never end up paying the dollar into the revenue stream because they— I just—I guess I'm having a hard time understanding. Well, why doesn't that mean that the vast majority of the people who did contribute their revenue, they must have— Well, I think that, Your Honor, the testimony of the consumers who testified live at trial give an explanation for that, where they did not realize, one, until five months of billing had gone by, she was not checking her credit card statements, or if she was, she was not noting that particular charge. It was only after five months that she realized that she was being billed for a monthly program that she had not even subscribed to. So, you're right. We do not know, then, for the—even if you accept the 46 percent, 45 percent, and the commission's expert was not able to square the database that defendants had with that number. But in any event, even if you were to consider that, the consumer testimony and the complaints that were received by the company, which provided example after example of— Let me try to boil down your position on the figure, then. You say that, look, we as the FTC, we can come in, and once we've shown that these representations are just sort of inherently misleading, we get—we basically get the benefit of a presumption that 100 percent of the revenue the company took in as a result of those representations is ill-gotten gain. Yes. Then the defendant—the burden shifts to the defendant to basically subtract out any people who really weren't deceived. You say that they completely failed because they came forward with basically no— Yes, Your Honor. Their number was zero. Yes. And then at that point, whatever arbitrariness exists in the 50 percent cut is in the defendant's favor? Is that where you kind of end up? No, Your Honor. When left with that, the district court has— Well, your position is that it should have been the 100 percent, right, given that the defendant totally failed in his burden? To the extent that there is any—and the case law makes clear—to the extent that there is any uncertainty on this, the wrongdoer does not benefit from that. If it's between the consumers and their losses and the wrongdoer. And in this case, the court had—the court could have, based on their failure to come forward with any specific—it could have awarded 100 percent of the amount. But that's why your position seems kind of like no harm, no foul, right? Well, certainly, yes. Because that 50 percent reduction, it just seems a little arbitrary. I mean, I think you've heard from all of us that it just—where did that number come from, right? So—but you're—if I understand what you're saying, though, it's like, well, okay, it might have been a little arbitrary, but it was all in the defendant's favor, so we shouldn't find that to be— It cannot be an abuse of discretion for this court to cut that amount in half. If it could have been so much higher, could have been 100 percent, whatever question there may be as to the evidence that underlay that specific 50 percent reduction, it cannot be an abuse of discretion for the court to have cut that amount, given the record in this case. Well, it seems that this is a little bit tied to—Counsel for the FTC in the last case said that Great West had nothing to do with this particular case. But I'm wondering, if only equitable rather than legal restitution is available under 13B, why wouldn't the Supreme Court's limitation on equitable restitution discussed in Great West, such as traceability, have some application here? I mean, basically, your presumption says we don't have—there is no—it doesn't—it's 100 percent. I don't think that we can presume that the Great West limitation to equitable restitution applies in the context of 13B. And this court, I believe it was Inc. 21, which was a 2012 case, I believe that in that case the court said, in the context of 13B of the FTC Act— Equitable restitution generally. And do you agree that under 13B it is equitable rather than legal restitution? No, Your Honor. I think that the authority, once the court has the authority ancillary to issuing injunctive relief, to issue whatever relief— Vindication of a public interest is at issue? Yes, Your Honor. It takes on the broader authority. I actually think that there is also the Second Circuit in discussing verity, and this court has rejected verity. But it's a little bit, trust me, where the government— Well— We're here to help. I would say that that's not the argument I'm making, although certainly I agree with that proposition. But, I mean, I think that there are some limiting principles to the type of relief, not limited to what has been traditionally been held. It's kind of hard to—we're having a big discussion over this in the last two cases, and I don't want to be overly simplistic, but it seems like the limiting principles are what the government agrees with. That's what a limiting principle is. But our position is a little bit—we're stepping back from you, and if we're going to write an opinion, if everyone seems to agree there are some limiting principles, the answer can't be only the ones that you like. I mean, the rule has to be— Well, okay, so for example, one limiting principle, I think, is that, unlike other cases, in the FTC Act context, we're looking at the transaction and the harm flowing from the transaction. We're not looking at individualistic consumer harm that individuals might incur beyond the money that they paid over to the scheme. They might have consequential damages. There might be other forms of legal damages. Those are not involved in the context of the FTC Act or under Section 13. I've taken you into overtime. Unless any of my colleagues have additional questions, I'll conclude your argument. Thank you. Thank you, Counsel. All right, Mr. Chemerinsky, I've given you a little more, but if we take you into overtime, obviously you're sophisticated, you know you get to keep talking, so go ahead. Thank you. I think with regard to remedy, this Court faces three questions. First— I think his clock—why don't you put it at 6? Just put it at 6. I think with regard to remedy, this Court faces three questions. First, what is a permissible equitable remedy under Section 13b? I believe that Great Westbrook's Knudsen does discuss the distinction between equitable and legal remedies. As I've argued, an equitable remedy has to be restitution. That's what it means to say it's an ancillary remedy, and restitution is calculated by disgorgement or losses traced to specific individuals. The attorney for the FTC says it's measured in terms of the amount of consumer loss. That would be indistinguishable from a damages remedy. What makes it an equitable remedy is if it is either disgorgement of what the defendant received, or, as Great West says, a loss that's traced to specific consumers. The second question that this Court faces, is joint and several liability permissible as an equitable remedy? As Judge Watford points out, the district court does not say this is joint and several liability. That appears in the brief that's presented by the FTC. As I explained earlier, traditionally there was not joint and several liability in equity, because equity was just about the individual disgorging his or her ill-gotten gains. Now that restitution has been expanded to losses traced to specific individuals, we would agree there could be joint and several liability for those losses that are traced to specific individuals. That, of course, is not what happened here. Stefanczyk does not discuss the concept of joint and several liability. Stefanczyk was an instance where the individual was indistinguishable from the corporation, and the Ninth Circuit made that clear. How about the Gill case is the other one? And, Your Honor, we discussed the Gill case, our reply brief, on pages 25 and 26, and that, too, did not involve joint and several liability. What we write on page 25 of our reply brief, for instance, FTC v. Gill, one defendant crafted the misrepresentations, developed the unlawful business methods, and committed the conduct that drove the scheme, while the other defendant owned and controlled the business through which the scheme was perpetrated. And I would argue, as I said earlier to Judge Owen's question, this Court has not directly addressed the concept of joint and several liability under Section 13B, and it is inconsistent with traditional notions of equity that are based on disgorgement. When you were up before, you said that the SEC cases you thought were distinguishable because there's a different statutory scheme in place there. What's the difference that you think is relevant? I think that if you look at the Securities and Exchange Act, there was clearly a desire to create the joint and several liability. There's no such thing with regard to 13B. In fact, as we argue in our opening brief with regard to 13B, Congress meant that to be a traditional equitable remedy as distinguished from Section 19 of the Federal Trade Act, which creates the damages remedy, which does create entitlement to a jury trial. The final question that this Court faces is whether the remedy here is so arbitrary as to be an abuse of discretion. As I mentioned earlier and as argued in the brief, you had a third-year graduate student who said about 50% of the people were deceived. She provided no survey basis, no focus basis, no basis at all, and the judge imposed the remedy on that basis. Now, what was argued here was since Mr. Galuzza didn't prevent other evidence, 100% would be justified. That can't be right. Any remedy has to be based on the evidence of the case. Why isn't that right, though? If we were to adopt the burden-shifting framework that these other circuits have adopted, and I don't think we've done that yet explicitly, but if we were to follow it here, it seems to me they have made a showing that these representations were inherently misleading. So they say, okay, well, we're entitled to a presumption that all of the revenue generated by those is ill-gotten gain. You, the defendant now, have the burden of, you know, hey, do you want to come in with some theory as to proving which portion of the consumers weren't deceived? We'll hear it. But you came in and said, well, no, the number should be zero, and the district court rejected that. No, Your Honor. First, it's not a correct characterization. What Mr. Galuzza tried to do was to introduce an expert, Mr. Kenneth Deal, who had done a survey, and his survey showed that 90% of the people were not deceived. That survey was excluded because he wasn't the one who completed it. But I would argue that was an abuse of discretion, because under Rule 703 of the Rules of Evidence, and also in precedence of this Court, it's permissible for an expert to testify based on the surveys of others. But besides that, Your Honor, even if Mr. Galuzza hadn't had that expert, still any remedy has to be consistent with the evidence in the case. What you had here was 45% of the people canceled during the trial period. That means they were not deceived in terms of, or at least they came to know it was a negative option. So none of their money got into the pot. So, okay, great. So they weren't deceived. But so the money that did get into the pot wasn't that. Why can't we assume that that was from people who were deceived? But, Your Honor, the only basis for believing that people were deceived was, she refers to consumer complaints. There were two consumer witnesses who testified. We don't deny that some people were deceived. The question is what percentage of people are deceived. Well, the evidence, if I remember, were, I mean, it was in the tens of thousands of complaints from people who were saying, you know what, I thought I was just signing up for this, and I got stuck with this charge. I want to separate the mention of the witnesses at trial of consumers who were deceived, which were two, or other people. We don't deny that some people were deceived by the negative option. We do deny that it can be assumed that it was 100% who were deceived. When 45% canceled in the trial period, and what hasn't been mentioned. But the court can consider what he heard at the bench trial, correct? That's not siloed off from the restitution determination. Of course. But what I'm saying is that any estimate of the number deceived has to be based on the evidence in the case. The question is, from Judge Watford, could it be assumed that 100% of the people were deceived? And I said that the evidence in the record shows that 100% weren't deceived. And not only this. I'm with you on that. I agree with you. I'm sure there were some number of people who weren't deceived. But I'm saying if we adopt that burden-shifting framework, the burden then shifts to your client to show what percentage of the people weren't deceived. And if you fail to do that, then how is it an abuse of discretion for the court to say, okay, well then I'm going to just impose 100%. And here, you actually got a benefit because he cut it in half. But, Your Honor, the evidence in this case is inconsistent with even the 50%. Start with the 100,000 people who used the product to set up websites. Then add into that the 45% of the people who knew it was a negative option. Based on that, it's not possible to say that 50% were deceived. You're resisting my question. My question is, if we adopt the burden-shifting framework, the government comes in and establishes that there's at least a basis for believing that a large number of people were deceived. We think it should be 100%. The district court then turns to your client and says, okay, well, you know, if you think there's some methodology by which I can separate out the people who weren't deceived, I'll do it. And you say, well, I don't have any. So then the court could, I think, in that regime, say the uncertainty as to the number of people who weren't deceived, that falls on you. You haven't given me a way to separate them out. I'm going to impose 100% liability. Your Honor, two responses. First, it's an inaccurate statement what happened because Mr. Galuzza did have an expert who was going to testify to this to an amount. And we did that through abuse of discretion. And the second is, still, whatever estimate had to be consistent with the rest of the evidence in the case. And we believe that here the 50% is not consistent with the other evidence that was before the district court. And so in the end, Your Honor, when it comes to the question of remedy here, I believe it really does tie back to what Great Westford's Knudsen says. A legal remedy is different from an equitable one. An equitable remedy is about disgorgement or losses traced to specific victims. The district court error here. Judge Owens has another question. Oh, sure. If you want to wrap up. That's okay. You're not wrapping now. Thank you. We've been using the term the percentage of customers deceived. I'm wondering if that's the right question to ask. Shouldn't it be the percentage of dollars, I'll call them deceived dollars? For example, if you have 1,000 people and half of them aren't deceived and they don't pay any money, they're not part of this $36 million. The money that came in, that's the money you have to look at. So I'm just wondering if you could respond to the idea that it's not the percentage of people who were deceived or not deceived, it's the percentage of dollars, which I'll now call deceived dollars. I think you're absolutely right. I think this also shows why the testimony that the district court relied on from Jennifer King wasn't relevant. What she said was she thought about 50% of the people were deceived. The judge then took the total amount of revenue, 36.4, and divided it in half. Your question shows why it has to be traced to specific dollars, and that's what Great West Virginia says, and that's what didn't happen here. All right. I think we've had our questions answered and we're over our time. I want to thank all the counsel in the last two cases for good discussion, and both of this matter will now stand submitted. Thank you.
judges: Callahan, Watford, Owens